**Barbara Mutsuko HASHIMOTO,**
**Plaintiff,**

v.

**John H. DALTON, Secretary**
**of the Navy, Defendant.**

**Civ. No. 91–00081 ACK.**

United States District Court,
D. Hawai'i.

May 25, 1994.

Clayton C. Ikei, Honolulu, HI, for plaintiff.

Daniel A. Bent, Theodore G. Meeker, U.S. Attys. Office, Honolulu, HI, R.T. Lee, W. Area Counsel Office, Marine Corps Base, Camp Pendleton, CA, for defendant.

*ORDER VACATING JURY VERDICTS*

*AND*

*DECISION*

*AND*

*FINDINGS OF FACT AND CONCLUSIONS OF LAW*

KAY, Chief Judge.

Two juries awarded Plaintiff $300,000 and $280,000, respectively, in compensatory dam-ages. However, the United States Supreme Court has subsequently ruled that the 1991 amendments to the Civil Rights Act of 1964 do not apply retroactively (contrary to an earlier holding of the Ninth Circuit); and therefore Plaintiff was entitled to neither a jury trial nor to any compensatory damages. It remains for this Court, as the trier of fact, to decide whether Plaintiff is entitled to any equitable relief including attorneys' fees and costs, backpay, reinstatement, and prejudg-ment interest. Those are the only remedies available to Plaintiff.

This is a Title VII case brought by an Asian–American female against the Depart-ment of the Navy. Plaintiff alleges disparate treatment on the basis of race and/or gender because of adverse personnel actions taken against her while employed as a budget as-sistant at Camp Smith. Plaintiff also alleges that Defendant subsequently retaliated against her for filing an EEO complaint when Defendant gave a negative job refer-ence and mentioned her EEO activities to a prospective employer. The retaliation issue (Case 2) was bifurcated from the disparate treatment issue (Case 1) for purposes of trial.

After a first jury trial on the Case 1 issue of disparate treatment, a jury returned a verdict for Plaintiff. The jury found that Plaintiff's gender and/or race was a motivat-ing factor in causing Plaintiff to be suspend-ed for 14 days and in being denied a Within Grade Increase in salary. The jury further concluded that Plaintiff would not have suf-fered these adverse actions had not Defen-dant considered Plaintiff's race and/or gen-der. The jury awarded Plaintiff $14,000 in compensatory damages for the 14 day sus-pension and $286,000 in compensatory dam-ages for the denial of the Within Grade In-crease.

Defendant subsequently filed a motion for judgment as a matter of law, or in the alter-native, for new trial in Case 1. This Court denied Defendant's motion for judgment as a matter of law, but granted Defendant's mo-tion for new trial. In summary, in ordering a new trial the Court found that (1) the jury's verdict was against the clear weight of evi-

dence; (2) Plaintiff lacked credibility, and her testimony constituted virtually the only evidence tending to show racial or gender discrimination on the part of Defendant; (3) Plaintiff's counsel utilized improper jury argument; and (4) the jury's damages award was excessive. The "evidence" presented at the first trial was too vague to establish $300,000 in compensatory damages, particularly when Plaintiff's counsel only requested a figure of $200,000 and was admittedly surprised by the size of the verdict.

A second Case 1 trial was held in October 1993. During this trial, Plaintiff's counsel no longer utilized improper jury argument and when the jury returned its verdict, it found that the denial of Plaintiff's Within Grade Increase by Defendant was not based on race and/or gender discrimination. The jury found, however, that Plaintiff was discriminated against when she was suspended for fourteen days and awarded her $280,000.00 in compensatory damages.

The Court then proceeded to try Case 2 before the same jury. Plaintiff was allowed to accept as binding the finding of the Equal Employment Opportunities Commission that Major Lowery had unlawfully retaliated against Plaintiff by making a negative job reference, but she was allowed to relitigate the issue of whether she would have been hired by the Army in the absence of the negative job recommendation. The jury returned a verdict which held that the negative reference was a motivating factor in the Army's decision not to hire her, but that Plaintiff would not have received the position even in the absence of the negative reference.

After the second trial, Plaintiff moved this Court for equitable relief including attorneys' fees and costs, backpay, reinstatement, and prejudgment interest. Defendant again moved for judgment as a matter of law, or, in the alternative, for a new trial on the issue of the fourteen day suspension and damages.

Throughout the litigation of this case, the Court and parties have been aware that the issue of the retroactivity of the 1991 amendments to the Civil Rights Act of 1964 was argued before the United States Supreme Court in October 1993 and pending before the Supreme Court. The Ninth Circuit has held that the amendments apply retroactively. *See Estate of Reynolds v. Martin*, 985 F.2d 470 (9th Cir.1993). In anticipation that a finding by the Supreme Court that the amendments were not retroactive would eliminate the right of Plaintiff to a jury trial and compensatory damages, this Court deferred from ruling on Defendant's post-trial motion for judgment as a matter of law or new trial (as well as on Plaintiff's motion for equitable relief). Additionally, in order to avoid a third trial in the interests of justice and judicial economy, this Court ordered the parties to submit proposed findings of fact and conclusions of law based on the evidence admitted during the second trial.

Subsequent to this, the Supreme Court has ruled that the 1991 amendments to the Civil Rights Act of 1964 are not retroactive. *Landgraf v. USI Film Products*, —— U.S. ——, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994). Accordingly, Plaintiff was not entitled to a jury trial or compensatory damages and Defendant's motions are moot. Hence, the Jury Verdicts in Case 1 and Case 2 are vacated, and this Court is now obligated to act as finder of fact and rule in the form of the findings of fact and conclusions of law set out below.

Before setting out the findings of fact and conclusions of law, however, it is necessary to address the two jury verdicts that were returned in the two trials of Case 1. This Court finds that the two verdicts were inconsistent, excessive, and against the clear weight of the evidence.

As noted above, in the first trial the jury awarded Plaintiff $286,000.00 for the denial of Within Grade Increase and only $14,000.00 for the fourteen day suspension. The Court found that Plaintiff's counsel's improper jury argument tainted the issue of the denial of Within Grade Increase. This is confirmed by the second trial where there was no improper jury argument and the jury returned a verdict in favor of Defendant on the issue of the Within Grade Increase. The second jury, however, returned a verdict of $280,000.00 for the fourteen day suspension after the first jury only awarded $14,000.00 for the

same adverse action. The two verdicts demonstrate that neither jury supported the other on either issue. The inconsistent verdicts and awards indicate that the juries sympathized with Plaintiff but that neither jury supported the other as to the merits of either cause of action.

Additionally, the Court notes that during the second trial, Plaintiff's counsel referred to an alleged reference to Plaintiff as a "slant-eyed Jap", although counsel admitted in open court that he did not have a good faith basis for making the reference. This is the only purported evidence of a derogatory racial slur that Plaintiff attempted to produce in two trials.

While it might be more popular for the Court to issue a decision awarding a sizable sum to Plaintiff as did the two jury verdicts, although they contradicted one another (and this Court has no authority to award compensatory damages in any event); this Court is compelled in the interests of justice and fairness to render a decision based upon the evidence as it finds it, rather than upon sympathy. The Court came very close to granting summary judgment in favor of Defendant on all of Plaintiff's claims but in an abundance of caution and in an effort to afford Plaintiff every opportunity to prove her case, this Court allowed Plaintiff to proceed to trial on the claims related to her 14 day suspension and the denial of her Within Grade Increase despite finding her evidence to be "sketchy at best". Additionally, the Court allowed Plaintiff to amend her complaint to seek "enforcement" of the EEOC's finding on her Case 2 claim which was favorable to her while enjoying a trial de novo on the remaining issues. Moreover, the Court refused to follow the recommendation of the Magistrate Judge to disallow the amended complaint because Plaintiff's counsel failed to file it within the allotted time.

This Court concludes that the adverse personnel actions taken against Plaintiff were not the result of any discriminatory animus but rather because of her repeated refusal or failure to follow instructions, her refusal to perform assigned tasks, her obstinate manner of dealing with her superiors, and her inability to work under the supervision of military officers. Likewise, this Court finds that Plaintiff's Case 2 claim is meritless because the Army would not have hired Plaintiff even if a negative job reference had not been made.

It is the finding of this Court that Plaintiff is not entitled to any equitable relief in Case 1 and Case 2, with the exception of reimbursement for the attorneys' fees and costs expended on her Case 2 retaliation claim to the extent the expenditures relate to enforcement of the EEOC's award of her attorneys' fees, to which she also is entitled.

This Court's conclusions are more fully supported by the accompanying findings of fact and conclusions of law.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### I. FINDINGS OF FACT

A. Procedural History

1. This is an employment discrimination case arising out of Plaintiff's former civilian employment with Defendant at Camp H.M. Smith, Hawaii. The Court had jurisdiction over Plaintiff's claims and venue is appropriate. 42 U.S.C. §§ 2000e, et seq.

2. Plaintiff, Barbara M. Hashimoto, was employed as a Budget Analyst, GS-7, at Camp H.M. Smith from April 2, 1984 through June 2, 1986. She brings this action, generally alleging unlawful discrimination and retaliation during and after her former federal employment pursuant to § 717 of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-16.

3. Just prior to Plaintiff's removal due to a reduction in force (RIF) in June 1986, she initiated her first of two administrative complaints. In that complaint ("Case 1"), Plaintiff alleged that, because of her race and/or gender, she was suspended without pay on two occasions, denied a within grade salary increase, and eventually lost her job when her position was RIF-fed.

4. Later, while her first complaint was being investigated, Plaintiff filed her second administrative complaint ("Case 2") in which she has alleged that she suffered a negative

referral by one of her former Marine Corps supervisors when she applied for a job with the Army in retaliation for filing her Case 1 administrative complaint.

5. Both administrative complaints were consolidated for investigation and were the subject of an adversarial hearing before an Administrative Judge from the Equal Employment Opportunity Commission ("EEOC").

6. The Administrative Judge found no discrimination on any of Plaintiff's claims and Defendant adopted that decision as its final agency decision. On administrative appeal, the EEOC's Office of Review and Appeals affirmed.

7. Upon further administrative appeal, the EEOC affirmed the finding of no discrimination on all of Plaintiff's Case 1 claims, but found "mixed motives" on Plaintiff's single Case 2 claim. Specifically, the EEOC found that the negative referral by Plaintiff's former supervisor was motivated by a retaliatory animus but that Plaintiff would not have been selected for the position with the Army even absent the retaliatory referral.

8. Initially, Plaintiff sought a trial de novo on all five of her administrative claims. Prior to trial, however, Defendant obtained summary judgment on the first suspension and the RIF claims. The Court came very close to granting summary judgment on all of Plaintiff's claims but in an abundance of caution and in an effort to afford Plaintiff every opportunity to prove her case, this Court allowed Plaintiff to proceed to trial on the claims related to her 14 day suspension and the denial of her Within Grade Increase despite finding her evidence to be "sketchy at best". Additionally, the Court allowed Plaintiff to amend her complaint to seek "enforcement" of the EEOC's finding on her Case 2 claim which was favorable to her while enjoying a trial de novo on the remaining issues.

9. There were two jury trials of the Case 1 claims because, at the time of trial, the law of this circuit entitled Plaintiff to a jury trial. The first trial ended in a verdict for Plaintiff, but that verdict was vacated and a new trial ordered on numerous grounds.

10. A second trial was held on Case 1 and Case 2 was also tried before a jury. The jury verdicts in Case 1 and Case 2 are vacated in light of the United States Supreme Court's ruling that the 1991 amendments to the Civil Rights Act of 1964 which provided for jury trials and compensatory damages were not retroactive in application.

11. The Court and the parties were aware that the United States Supreme Court had heard arguments on the issue of retroactivity at the time of the second trial of Case 1. In light of the pending decision on retroactivity, and in order to avoid a third trial in the interests of judicial efficiency and economy, the parties were instructed to submit proposed findings of fact and conclusions of law.

B. Background

12. Plaintiff, Barbara M. Hashimoto, is a woman of Japanese ancestry.

13. Craig Hinman, Plaintiff's immediate supervisor during the period from July 1984 to April 1986, is a Caucasian male. Steven Lowery, Plaintiff's second line supervisor from September 1984 to April 1986 is also a Caucasian male.

14. Plaintiff began her employment at Camp Smith in April 1984. She was hired as a Budget Analyst, GS–561–7, within the Special Services section of the camp.

15. Initially, Plaintiff worked for Captain Cargill, a Caucasian female, with whom Plaintiff worked well.

16. In May 1984, Captain Cargill left her position as a Special Services Officer and her position was vacant until Captain Craig Hinman reported as Special Services Officer in July 1984.

17. Prior to July 1984, Hinman had not supervised civilian employees of the United States Marines, had not been a special services officer, and had not received any training in budgetary and inventory control.

C. Case 1

18. Soon after the arrival of Hinman, the Special Services section was consolidated with the Camp's Clubs System, forming a

unit referred to as Morale, Welfare and Recreation ("MWR"). While the Special Services section and the Clubs System sections remained, administrative and clerical support personnel from both sections were consolidated within a new section referred to as the MWR Administrative Support Unit ("MASU"). This consolidation began in September 1984.

19. The head of MWR during Plaintiff's employment was Major Steven Lowery. Lowery was Hinman's immediate supervisor and Plaintiff's second level supervisor.

20. There were three billets under Hinman's direct supervision: (1) the Athletic Director, filled by Hal Nakabayashi, an Asian–American male; (2) the Recreation Director, filled by an active duty male Marine; and (3) the Budget Assistant, filled by Plaintiff.

21. Soon after the consolidation, Plaintiff began experiencing problems in her employment. A co-worker of Plaintiff, Joan Goodman, a Caucasian female, had worked in Special Services but had left Camp Smith on vacation and sick leave from June 1984 until October 1984. During this period, Plaintiff was required to take over some of Goodman's responsibilities.

22. Goodman did not return to work until after the consolidation had begun. Goodman's billet was transferred to the MASU and she was never under Hinman's supervision.

23. Although Goodman's billet was transferred as part of the consolidation, this Court finds by a preponderance of the evidence that the tasks taken over by Plaintiff were assigned to Plaintiff by Hinman as part of the consolidation. In performing those tasks, this Court finds that Plaintiff was performing her own assigned duties, not the duties of her co-worker Goodman, whose position had been transferred to the MASU.

24. Plaintiff subsequently requested leave on the day following Thanksgiving 1984. The undisputed testimony is that Plaintiff asked for leave and it was denied. This Court finds by a preponderance of the evidence that the reason that the leave request was denied was because Hinman and Lowery believed that Plaintiff needed to complete certain of her assigned tasks in order for the consolidation to go forward as scheduled. Specifically, the Special Service accounting books had to be brought up to date in order for the books to be consolidated with the Clubs System books. This Court further finds that Hinman and Lowery believed that the tasks which Plaintiff was required to complete on the day after Thanksgiving were the responsibility of Plaintiff, not those of Joan Goodman. There is no evidence that this decision was based on Plaintiff's race and/or sex.

25. Additionally, Plaintiff's allegations that all of her leave requests were denied is rebutted by the undisputed evidence from Plaintiff's Master Leave Plan that she used 106 hours of annual leave during 1985. Def.'s Exh. 73.

26. Shortly after this incident, on November 30, 1984, Hinman revoked Plaintiff's authority to sign documents on behalf of Special Services. Def.'s Exh. 52. The Court finds, by a preponderance of the evidence, that this act was not motivated by discrimination but was necessitated by Plaintiff's act of authorizing a single purchase which exceeded an entire quarterly budget.

27. On December 3, 1984, Plaintiff received a written instruction to check in with Hinman at the beginning of each day and check out with him at the end of each day. Def.'s Exh. 53.

28. Plaintiff claims that she was the only employee who was required to attend daily briefings. This allegation was decisively rebutted by the testimony of a number of civilian witnesses who testified that they attended such briefings with Hinman or Lowery on a daily basis, as was the practice in the military.

29. Hinman concedes that Plaintiff was the only employee who was given a written order to attend such briefings. However, this Court finds by a preponderance of the evidence that the written order was only given after repeated oral counseling failed and that other employees regularly attended such briefings without repeated instruction on the part of Hinman. Plaintiff also con-

ceded that the written instruction came after she had left work early without informing Hinman, who had then been unable to locate her.

30. Plaintiff also contradicts her own testimony that only she was required to attend daily briefings by asserting that the male employees regularly had their briefings with Hinman in the snack bar while she alone was required to attend such briefings in Hinman's office. The testimony of Hal Nakabayashi establishes that he and the Recreation Director would attend briefings together at times and at times would attend them separately, dependent upon their job duties and schedules. Although Nakabayashi did testify that he did sometimes meet with Hinman in the Snack Bar, there is no evidence that the Recreation Director likewise did so.

31. Finally, Plaintiff testified that the twice daily briefings often lasted over an hour and required Plaintiff to stand in front of Hinman's desk while Hinman either sat in absolute silence or subjected her to insults and vulgar behavior.

32. This Court finds, by a preponderance of the evidence, that the briefings were not required of Plaintiff alone and that all employees were required to attend. This Court further finds that the fact that Hinman occasionally held a briefing with Hal Nakabayashi in the snack bar does not constitute evidence of discrimination. Finally, not one witness could corroborate Plaintiff's allegations concerning the length and content of her briefings with Hinman and this Court finds these allegations to be incredible. Hinman testified that these meetings were of a few minutes duration.

33. This Court finds that Plaintiff's continued failure to attend daily briefings and her refusal to forward a response to an auditor's report as requested by Hinman motivated Hinman to issue a Letter of Caution on February 5, 1985. Def.'s Exh. 55. This Court finds that this letter was motivated by Hinman's honest belief that Plaintiff was derelict in obeying instructions. Indeed, this Court finds that Plaintiff's unequivocal refusal to sign to acknowledge receipt of this letter of caution and most other documents highlights the difficulty faced by Plaintiff's superiors in gaining compliance with their orders and work assignments.

34. Also on February 5, 1985, Plaintiff was given her "Basic Performance Appraisal Plan" (BPAP). Def.'s Exh. 69. This document listed the critical elements of Plaintiff's position and set forth standards on which her performance of those elements would be evaluated.

35. The testimony is undisputed that Hinman gave Plaintiff a copy of the BPAP but that Plaintiff disagreed with her assignment of duties as outlined in the document. For that reason, Plaintiff refused to sign the BPAP acknowledging that the elements and standards had been set.

36. Plaintiff maintained that her Position Description (PD) had become outdated in light of the consolidation into the MWR and the creation of the MASU. Hinman made attempts to have Plaintiff's PD rewritten but the personnel office returned the rewrite, stating that even after the revision, "the position remains classifiable as Budget Assistant, GS-561-7." Def.'s Exh. 56. There was undisputed testimony from Plaintiff's witness, Ray Mendez, the EEO counselor, that Hinman would have been entirely justified in relying on the Civilian Personnel Office's evaluation that Plaintiff's position description was valid.

37. One week after the personnel office affirmed Plaintiff's PD, Plaintiff sought assistance from an EEO counselor, Ray Mendez. Although Plaintiff went to the EEO counselor, the undisputed testimony confirms that Plaintiff did not believe she had a discrimination complaint and that Ray Mendez had to explain to her that the EEO dealt with discrimination complaints. Pl.'s Exh. 11. Nonetheless, Mendez wrote a memorandum to Mike Long of the Civilian Personnel Office asking that Plaintiff's complaint regarding her PD be looked into. *Id.* Moreover, Hinman invited Plaintiff to submit a proposed revised PD—and she never did.

38. Shortly thereafter, Joanne Felman of the personnel office conducted a "desk audit" of Plaintiff's position. Felman testified that this involved her visiting Plaintiff's worksite and jointly reviewing the PD, BPAP, and

Plaintiff's current duties with Plaintiff. Felman testified that Plaintiff's PD and BPAP were current and accurate during this time frame and that her assignment of duties under the BPAP was appropriate.

39. The testimony of Ray Mendez on this issue lacked credibility because his assessment of the PD and Hinman's actions was based solely on the information provided by Plaintiff, which did not include critical facts such as the personnel office letter to Hinman regarding the proposed rewrite (Def.'s Exh. 56). Additionally, he acknowledged that someone else might not think that the position needed to be rewritten.

40. This Court finds, by a preponderance of the evidence, that Plaintiff's PD and BPAP accurately reflected the work that Plaintiff was required to perform and upon which her performance was evaluated. This Court further finds that Hinman's evaluation of Plaintiff based on these documents was motivated by the honestly held belief that the PD and BPAP accurately reflected Plaintiff's assigned tasks, and was not motivated by race and/or sex discrimination.

41. Plaintiff received her first "mid-cycle review" under her BPAP on May 1, 1985. Def.'s Exh. 69. Plaintiff's overall rating was marginal. At this time, Hinman noted a number of concerns with Plaintiff's performance of her duties. Specifically, out of five "critical elements," Hinman rated Plaintiff unsatisfactory in two (Elements 1 and 4) and marginal in two others (Elements 3 and 5). Plaintiff refused to sign to acknowledge receipt of this review. This evaluation of Plaintiff's performance led to another Letter of Caution on June 28, 1985. Def.'s Exh. 58. In addition to setting out the areas of deficient performance, this letter made suggestions concerning how Plaintiff could work to improve her performance. Plaintiff refused to sign to acknowledge receipt.

42. This Court finds, by a preponderance of the evidence, that this assessment of Plaintiff's performance was based on the honestly held belief that Plaintiff's performance was indeed marginal and was not motivated by any discriminatory animus.

43. On July 30, 1985, Hinman issued his first proposal to suspend Plaintiff. Exh. 59. In this action, Hinman proposed to suspend Plaintiff for five days based on charges that she was continuing to fail to attend daily briefings, that she missed a deadline regarding some correspondence addressing a financial management inspection without letting Hinman know in advance of a problem, that she refused to prepare a letter concerning insurance coverage stating that it was not her responsibility and that she had refused to cooperate with MASU personnel regarding a backlog of clerical work. *Id.*

44. Plaintiff submitted a written rebuttal to these charges to Lowery, who was the deciding official. Lowery conducted an informal investigation into the situation between Plaintiff and Hinman. Based on the investigation, Lowery found that the charges were sustained, but that delay on his part caused by his investigation merited a mitigation of the penalty to an admonishment. Exh. 64–65. This Court finds that the actions of Hinman and Lowery were motivated by the honestly held belief that Plaintiff was negligent in the performance of her job duties and not by any discriminatory animus.

45. This proposed suspension constitutes part of Plaintiff's allegations concerning clerical help. Plaintiff's billet did not include supervisory responsibilities and there were no employees subordinate to her. Although Plaintiff did receive clerical assistance from Maria Alvior for a time, testimony establishes that Alvior's position, a clerical position, was transferred to MASU along with all other clerical positions in MWR. Plaintiff could have requisitioned clerical help through MASU, but this Court finds, by a preponderance of the evidence, that she ignored instruction to do so.

46. Plaintiff's allegations that her male counterparts had clerical help attached to them is rebutted by the testimony of other witnesses. This Court finds, by a preponderance of the evidence, that all clerical positions were transferred to MASU and that clerical help could only be requested through MASU. This Court further finds, by a preponderance of the evidence, that to the extent that the other employees under Hin-

man's direct supervision had assistance it was because these were supervisory positions which had enlisted personnel directly assigned as subordinates as part of the overall structure of MWR. These enlisted men were not assigned as clerical help. Indeed, the undisputed testimony of Hal Nakabayashi established that he did his own typing. Additionally, the undisputed evidence demonstrated that Russ Johnson, a white male who held the Clubs System position equivalent to Plaintiff's position, had no clerical help and received help through MASU. This Court holds that the evidence establishes that Plaintiff had the same access to clerical help that every one in MWR was given.

47. The next incident in Plaintiff's employment occurred on November 22, 1985. Ms. Evelyn Mau, also an Asian–American civilian employee in Special Services, testified that she had experienced problems with Plaintiff, who was responsible for delivery of paychecks to the civilian workforce in Special Services. This dispute resulted in a written complaint by Mau to Hinman, dated November 21, 1985, regarding delivery of paychecks. Def.'s Exh. 100. Thereafter, Hinman gave a written instruction to Plaintiff that she was to personally deliver paychecks to the library personnel on the day they were issued. Exh. 67.

48. According to Hinman, Plaintiff flatly refused to personally deliver checks. Although Plaintiff testified that she never refused to deliver the paychecks, she has previously admitted that she refused to deliver the paychecks. *See* Def.'s Exh. 77 ¶ 7.c at 6. Defendant has argued that this issue was a pretext because Hinman never subsequently corroborated that the paychecks were being delivered. However, Hinman's testimony establishes that although the paycheck problem had been resolved the reason that Plaintiff was disciplined was because of her unequivocal refusal to deliver the paychecks after the task was assigned to her by Hinman. This Court finds that this episode represents yet another example of Plaintiff's refusal to heed the instructions of her supervisors and that this blatant refusal to heed instructions was the reason for the disciplinary action. This Court finds that neither Hinman nor Lowery

were motivated by any discriminatory animus.

49. At approximately the same time as the dispute concerning delivery of the paychecks, in November 1985, Plaintiff turned in a time card showing the she had worked a day when, in fact, she had been on approved leave. When this was discovered and Hinman queried Plaintiff about it, Plaintiff explained that this was so that she could have compensatory time off for overtime she had allegedly worked in August 1984—fifteen months earlier. When Hinman instructed her this was not permissible under the regulations and to change the time card to reflect her leave use, she refused.

50. Based on the time card incident and the delivery of the paycheck incident, as well as Plaintiff's alleged continued failure to attend daily briefings, Hinman, on December 6, 1985, again proposed that Plaintiff be suspended for five days. Exh. 70. Plaintiff did not make either a written or oral reply to this proposed action and Lowery decided to impose this proposed action, suspending Plaintiff for five work days effective January 27, 1986. Def.'s Exh. 74.

51. This suspension was affirmed by the base commanding officer. Def.'s Exh. 82. Although the commanding officer stated there was insufficient evidence that Plaintiff failed to keep Hinman appraised of her whereabouts, the commanding officer found that Plaintiff's "deliberate refusal" to amend her time card and to deliver pay checks warranted a five day suspension. *Id.* There has been no allegation that the commanding officer's decision to affirm the suspension was motivated by any discriminatory animus.

52. This Court finds that the evidence establishes that Hinman and Lowery honestly believed that the five day suspension was warranted for the reasons set out above. A preponderance of the evidence demonstrates Plaintiff refused to follow the instructions of Hinman and was suspended accordingly. This Court finds no evidence of discrimination on the part of either Hinman or Lowery related to this adverse personnel action. Notwithstanding the fact that Hal Nakabayashi would occasionally play tennis for an hour or two during the day when he would work

nights in attending athletic events in his capacity as Athletic Director, this Court finds that there was absolutely no evidence that other employees were ever allowed to claim comp time over a year after the comp time was allegedly earned. Additionally, the Court notes the testimony of Lowery that this suspension was part of an increasing level of punishment because earlier, lesser measures had not succeeded in encouraging Plaintiff to perform her assigned job duties and follow instructions from her supervisors.

53. On December 9, 1985, Plaintiff requested a meeting with the base commander through Lowery. The Court finds, by a preponderance of the evidence, that Lowery denied this meeting because Plaintiff failed to follow base procedure by submitting the request, in writing in a sealed envelope, to Lowery for submission to the base commander.

54. The final confrontation between Plaintiff and Hinman concerned Hinman's written instruction to prepare a turnover file as a letter of instruction. Pl.'s Exh. 20. Plaintiff was given until January 1, 1986 to have this completed.

55. Plaintiff submitted a written note regarding this instruction, asking Hinman to "confirm that it is the desk top procedure that I suggested I do in Feb 1985 that you wish me to do." *Id.* Hinman responded by providing Plaintiff with the local instruction on desk top procedures and turnover folders. Def.'s Exh. 107.

56. Although Plaintiff contends that she already had a turnover file prepared, Plaintiff concedes that she did not provide it to Hinman. When Plaintiff failed to provide the document, he proposed that Plaintiff be suspended for fourteen days. Def.'s Exh. 75. Plaintiff responded to this proposal by stating that "Capt. Hinman was asking me, I felt, to do his job by doing this letter of instruction, as it would have been from him." Def.'s Exh. 85.

57. Lowery decided to impose the fourteen day suspension based on his belief that Plaintiff understood what was being asked of her but that she was refusing to do as she had been told. Def.'s Exh. 87.

58. This Court finds that the evidence establishes that Plaintiff was suspended for fourteen days for failure to follow orders. This Court finds credible Lowery's testimony that even if the assigned task was trivial, Plaintiff's repeated and continuous failure to follow orders was not trivial and that a fourteen day suspension was warranted in light of the failure of previous disciplinary actions to gain Plaintiff's compliance.

59. Based on the numerous confrontations between Plaintiff and Hinman, as well as Plaintiff's continuous refusal to acknowledge that she was required to perform the tasks which Hinman assigned, Plaintiff's final performance evaluation was an overall rating of marginal. Def.'s Exh. 69, 89. The undisputed testimony of Joanne Felman established that civilian employees whose current performance evaluation is marginal are not eligible for a within grade increase (WGI). As a result, Plaintiff was denied a WGI when she became eligible in April 1986. Def.'s Exh. 89.

60. Shortly after the WGI denial, Plaintiff's position was eliminated in a RIF and her employment was terminated.[1] Plaintiff's position was not alone in being RIF-fed. Among the others whose positions were involved in the RIF included Guy Guessford, a white male, and Russ Johnson, a white male who held the equivalent position to Plaintiff in the Clubs System. This Court finds, by a preponderance of the evidence, that the RIF was not personal to Plaintiff because another position exactly like Plaintiff's was involved in the RIF as well, even though it was held by a white male.

61. Plaintiff argued that her RIF was discriminatory because even though Russ Johnson's position was RIF-fed as well, Johnson was given a temporary position as acting head of the Clubs System. This Court finds this argument to be lacking because the undisputed testimony established that Plain-

---

1. Plaintiff appealed her removal through the Merit Systems Protection Board. She allowed the MSPB decision sustaining her removal to become final, and this Court previously ruled in favor of the Defendant on this issue.

tiff was given the opportunity to apply for the position and did not apply. Indeed, the undisputed evidence established that Johnson's position was only temporary pending the appointment of a permanent director and Johnson refused to apply for the permanent position because Lowery insisted on opening the permanent position to applications from other potential applicants, including Plaintiff. Accordingly, this Court finds that Plaintiff's RIF was not discriminatory as evidenced by the contemporaneous RIF of similarly-situated white males and also by the undisputed fact that Plaintiff could have applied for a different position and refused to do so.

62. Both Hinman and Lowery presented testimony that they had first or second line supervisory responsibility over a number of Asian–American and/or females. Each testified that Plaintiff was the only Asian–American female who was subject to discipline by them. Although Lowery testified that he disciplined a white female, both Hinman and Lowery testified that the rest of those disciplined by them were males.

63. Additionally, other than Plaintiff's bald allegations, not one witness testified that they had observed Hinman or Lowery discriminate against anyone on the basis of race and/or sex. This included the testimony of white women, Asian–American women, and Asian–American men. The evidence established that Hinman had never before supervised civilians and Plaintiff's witnesses criticized Hinman not for discrimination, but for treating civilians like Marines. This is illustrated by the testimony of Guy Guessford.

64. Plaintiff did produce the testimony of Deborah Okamoto, an Asian–American female, who felt that she was sexually harassed by Hinman because he asked her out to lunch three times and made a joke about a Super Bowl ring. However, Okamoto stated that the treatment that she was subjected to was not encountered by the enlisted personnel, other officers there, or other females on the base. "So it was assumed that it had to do with the fact that it was because I was civilian." Okamoto Dep. at 27–28. She conceded that she was never adversely affected by refusing to go to lunch with Hinman and

that when she mentioned the lunch invitations to her supervisor, Hinman ceased asking her to lunch.

65. Additionally, this Court finds that the undisputed evidence established that Hinman is married to an Asian–American woman who was described as being strong willed. The Court finds that this fact evidences the fallacy of Plaintiff's theory that Hinman was biased against Asian–American women and expected them to be meek and subservient.

66. Finally, on the issue of credibility, witnesses testified that Plaintiff's character for truthfulness was lacking. On the other hand, witnesses uniformly testified to the fact that the character of Hinman and Lowery for truthfulness was above reproach. The attempts of Plaintiff's counsel to impeach the testimony of various witnesses with prior testimony from the many different proceedings over the last number of years only served to illustrate the difficulty witnesses faced in testifying to events of so many years ago. Further, much was made of the failure of Lowery to correct a mistake in an affidavit. This Court finds Lowery's testimony that it was an honest oversight to be credible and to be supported by the failure of Plaintiff's counsel to correctly count the corrections in the affidavit while going over the affidavit in minute detail during cross-examination.

67. In sum, this Court finds, by a preponderance of the evidence, that all of the disciplinary actions taken by Hinman and Lowery while Plaintiff was under their supervision to have been motivated by the honestly held belief, even if wrong or unfair, that Plaintiff was insubordinate and that the disciplinary actions were not motivated in any respect by a discriminatory animus.

### D. Case 2—Negative Job Reference

68. In July 1988, Plaintiff applied for a temporary position as a budget clerk with the Army at Fort Shafter. The selecting official, Mr. Richard Satake, arranged for an interview with Plaintiff. Before this interview, however, Satake contacted Major Lowery for an employment reference regarding Plaintiff.

69. Lowery informed Satake of Plaintiff's employment history to include the numerous attempts at counseling and her suspensions. Although he did include mention of her EEO complaint, the clear emphasis of Major Lowery's comments concerned Plaintiff's unwillingness to follow instructions or heed counseling. Def.'s Exh. 106.

70. After learning of Plaintiff's suspensions, Satake refused to consider Plaintiff for employment. Satake expressly denies having relied on the fact that Plaintiff filed an EEO complaint during his consideration of her application.

71. This Court finds that testimony of Plaintiff's sister that Satake asked why she had not informed him about Plaintiff's EEO activity to be lacking in credibility in light of the fact that (1) she refused to acknowledge on the witness stand that she had been called as Plaintiff's witness in previous administrative hearings despite the clear record of the previous proceeding; (2) given the fact that she had previously filed a discrimination suit against the officer who was sent to ask her questions about Plaintiff's case as part of the discovery process; and (3) her bias in favor of her sister evident from her demeanor.

72. As noted at the outset, Plaintiff's two administrative EEO complaints were subject to extensive litigation. In the final administrative decision on these claims, the EEOC found no discrimination during Plaintiff's employment at Camp Smith. With respect to the Army job, however, the EEOC found that Plaintiff was subject to retaliation by virtue of Lowery's comments, but it also found that Plaintiff would not have been selected for the Army position.

73. Plaintiff has been allowed to "enforce" that portion of the EEOC decision favorable to her—that Lowery's negative job reference was motivated by a retaliatory animus—while relitigating de novo the remaining issue of whether the Army would have hired her.

74. Although this Court finds that Lowery's negative job reference was motivated by the belief that Plaintiff was incompetent and insubordinate and not by a retaliatory animus, this Court will allow Plaintiff to enforce the EEOC's determination that the recommendation was motivated by a retaliatory animus. Lowery should not have referred to Plaintiff's EEO claim. In any event, this Court finds that the Army would not have hired Plaintiff even absent the retaliatory reference to Plaintiff's EEO activities in light of her marginal performance review and extensive disciplinary record.

75. Therefore, this Court finds that Plaintiff is entitled solely to an award of attorneys' fees and costs related to her Case 2 retaliation claim, in addition to the attorneys' fees awarded to her by the EEOC. This award is limited to that portion of fees and costs necessary to pursue enforcement of her retaliation claim and is not to include any amount related to Plaintiff's de novo relitigation of the issue of whether the Army would have hired her in the absence of the retaliatory reference. Plaintiff is not entitled to any other equitable relief related to Case 2. Additionally, Plaintiff is not entitled to any attorneys' fees or costs or other equitable relief related to the litigation of Case 1.

## II. CONCLUSIONS OF LAW

1. This Court has jurisdiction over Plaintiff's Case 1 and Case 2 claims pursuant to 42 U.S.C. §§ 2000e *et seq.*

### A. Case 1

2. The Supreme Court has established a clear framework for the evaluation of Title VII claims:

> In *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 [93 S.Ct. 1817, 36 L.Ed.2d 668] (1973), we set forth the basic allocation of burdens and order of presentation of proof in a Title VII case alleging discriminatory treatment. First, the plaintiff has the initial burden of proving by the preponderance of the evidence a *prima facie* case of discrimination. Second, if the plaintiff succeeds in proving the *prima facie* case, the burden then shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." *Id.* at 802 [93 S.Ct. at 1824]. Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove

by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a mere pretext for discrimination. *Id.*, at 804 [93 S.Ct. at 1825].

*Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981). *Accord St. Mary's Honor Center v. Hicks*, —— U.S. ——, ——, 113 S.Ct. 2742, 2753, 125 L.Ed.2d 407 (1993); *Odima v. Westin Tucson Hotel Co.*, 991 F.2d 595, 599 (9th Cir.1993).

3. The two Case 1 issues which remain for adjudication are whether Plaintiff suffered unlawful discrimination when she was suspended for fourteen days and when she was denied a within grade increase. On each of these issues, Plaintiff has established a *prima facie* case in that she was a member of one or more protected classes, she suffered some form of adverse employment decision, and others who were not in her protected classes were not subject to the adverse employment decision.

4. A defendant need only articulate—not prove—a legitimate nondiscriminatory reason for the personnel action being challenged. "The employer's burden is satisfied if he simply 'explains what he has done' ..." *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095 (quoting *Board of Trustees v. Sweeney*, 439 U.S. 24, 25 n. 2, 99 S.Ct. 295, 296 n. 2, 58 L.Ed.2d 216 (1978)). In this case, Defendant clearly articulated legitimate nondiscriminatory reasons for the actions taken: Plaintiff was suspended for fourteen days because she did not produce a turnover folder (in any format) as she had been instructed to do and she was denied a WGI because her performance had been rated as marginal.

5. At this stage in the analysis of a Title VII case, the burden on Plaintiff merges with her " 'ultimate burden of persuading the court that [she had] been the victim of intentional discrimination.' " *Odima, supra,* (quoting *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095). Plaintiff could have carried this burden " 'either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered expla-

nation is unworthy of credence.' " *Id.* Plaintiff did not carry this burden.

█ 6. Plaintiff expended the vast majority of her energies attempting to show that Hinman and, to a lesser extent, Lowery were not good supervisors of civilian employees. For example, Plaintiff's greatest apparent complaint concerning the turnover file order was the wording of Hinman's order. Hinman is not on trial for issuing poorly worded instructions, however, and Title VII does not offer relief for poor supervision or unfair employment in general.

7. The Ninth Circuit has only recently cautioned trial courts:

> The district courts must not substitute its own judgment about whether the employment decisions [at issue] were wise, or even fair, for that of the employer.... [T]he district court's conclusions must be based on factual findings grounded in the record, and not on vague, impressionistic notions that [defendant] must have discriminated against [plaintiff] because [she] is deserving of better [treatment].

*Odima*, 991 F.2d at 602. Plaintiff's evidence demonstrates, at most, that Hinman and Lowery may not have been accustomed to the differences in managing civilian and military personnel and this Court finds, by a preponderance of the evidence, that management decisions of Hinman and Lowery were not the product of any unlawful discrimination.

8. Plaintiff's other allegations that she was treated differently than others who were Caucasian and/or male were all decisively rebutted by evidence or are insufficiently indicative of any discriminatory animus. For example, Plaintiff's allegation that she was the only employee who was required to attend daily briefings was rebutted by the testimony of a number of witnesses; and her allegation that she never received annual leave while other white female employees did was rebutted by Plaintiff's 1985 master leave plan.

9. The Supreme Court recently made clear that the central issue in a Title VII case such as this is whether the plaintiff suffered the challenged personnel action because of

the characteristic protected by the statute. *St. Mary's Honor Center,* —— U.S. at ——, 113 S.Ct. at 2747. On this point, Plaintiff has offered only her conclusory allegation that Hinman and Lowery were motivated by a discriminatory animus. There is simply no evidence which backs up these allegations.

10. Because Plaintiff has failed to carry her burden as to any of the Case 1 claims she has presented, judgment is hereby ordered for Defendant.

**B. Case 2**

■ 11. A federal employee may seek enforcement of a favorable EEOC order in district court. *See Moore v. Devine,* 780 F.2d 1559, 1562–63 (11th Cir.1986); *Houseton v. Nimmo,* 670 F.2d 1375, 1378 (9th Cir.1982). A district court may enforce such an order without requiring de novo review of the merits. *Id.* Finally, if the court finds that the relief granted by the EEOC is insufficient, it may grant additional remedies as it deems appropriate. *See Pecker v. Heckler,* 801 F.2d 709 (4th Cir.1986).

■ 12. In the event that only a portion of the EEOC's findings are favorable to a plaintiff, the plaintiff may accept that portion of the EEOC's finding that is favorable while relitigating de novo that portion that is unfavorable. *See Morris v. Rice,* 985 F.2d 143 (4th Cir.1993); *Haskins v. Department of Army,* 808 F.2d 1192 (6th Cir.1987); *Pecker v. Heckler,* 801 F.2d 709 (4th Cir.1986). *But see, Cocciardi v. Russo,* 721 F.Supp. 735 (E.D.Pa.1989) (discussing fragmentary trials de novo). Accordingly, Plaintiff is able to accept as binding the EEOC's finding of retaliatory animus on the part of Major Lowery while being allowed to relitigate the damages issue related to whether Plaintiff would have been offered a job with the Army in the absence of the retaliatory employment reference.

■ 13. A negative job reference is an actionable negative personnel action under Title VII. *See Rutherford v. American Bank of Commerce,* 565 F.2d 1162 (10th Cir. 1977); *Pantchenko v. C.B. Dolge Co., Inc.,* 581 F.2d 1052 (2nd Cir.1978); *Shehadeh v. Chesapeake & Potomac Tel. Co.,* 595 F.2d 711 (D.C.Cir.1978). The Ninth Circuit has not explicitly so held, but has in dicta approved Title VII actions for negative employment references. *See London v. Coopers & Lybrand,* 644 F.2d 811, 817 (9th Cir.1981) (citing *Shehadeh, Rutherford,* and *Pantchenko* and allowing a former employee to sue under § 1981 for adverse job reference).

■ 14. This Court, having accepted the finding of retaliatory animus by the EEOC, is asked to determine whether the Army would have hired Plaintiff in the absence of the negative job reference. The undisputed testimony of Richard Satake established that he was not motivated by the retaliatory reference and would not have hired Plaintiff in light of her substantial disciplinary record and marginal performance rating. Plaintiff has failed to offer any credible evidence that Satake's decision was motivated, in whole or in part, by Lowery's retaliatory job reference.

15. Because Plaintiff has established that Lowery's job reference was motivated by an unlawful retaliatory animus, Plaintiff is entitled to an award of attorneys' fees and costs related to her enforcement action, in addition to her attorneys' fees awarded by the EEOC, but not for her counsel's efforts to establish that the Army would have hired her in the absence of the retaliation by Lowery. *See Smith v. Secretary of the Navy,* 659 F.2d 1113 (D.C.Cir.1981). This is the extent of the relief to which Plaintiff is entitled.

## CONCLUSION

16. Any finding of fact which may be deemed, in whole or in part, more properly a conclusion of law shall be deemed as such, and any conclusion of law which may be deemed, in whole or in part, more properly a finding of fact shall be deemed as such. All findings by the Court are based upon a preponderance of the evidence.

17. The Jury Verdicts in Case 1 and Case 2 are vacated.

18. This Court orders that judgment be entered for Defendant on Plaintiff's Case 1 claims.

19. This Court further orders that Plaintiff is entitled to reimbursement for the at-

**1558**

torneys' fees and costs expended on her Case 2 retaliation claims to the extent that the expenditures relate to enforcement of EEOC findings awarding her attorneys' fees, to which she also is entitled. This is the only equitable relief to which Plaintiff is entitled. The determination of such fees and costs is designated to a Magistrate Judge for a report and recommendation.

IT IS SO ORDERED.